TYSON, Judge.
The indictment charged Norman L. Brag-er, alias, with the first degree murder of Homer Willis Pearson “by shooting him with a pistol.” The jury found the appellant guilty of murder in the first degree and fixed punishment at life imprisonment. The trial court set sentence in accordance with the verdict.
Inasmuch as a complete statement of the facts is not necessary to an understanding of the issues in this case, and, moreover, because no motion to exclude the evidence was made, no request for the affirmative charge, nor a motion for a new trial challenging the weight and sufficiency of the evidence, a succinct statement of the evidence will be hereinafter set forth.
This cause arose from a shooting which occurred late Saturday evening on June 24-25, 1978, outside a casino belonging to one Robert Thompson near Kymulga in Tallade-ga County, Alabama.
The State’s witnesses established that the deceased, Homer W. Pearson, rode to Thompson’s club with one Robert Ballard on the night of Saturday, June 24, 1978, arriving there between 10:00 and 11:00 o’clock p. m. A crap game was in progress just outside the club and both Ballard and Pearson engaged in shooting dice with others in the proximity of the club. Later Pearson, according to the appellant, Brager, and two other witnesses became irritated when the appellant, Norman Brager, attempted to enter the crap game and, according to the appellant, recover some loss *402 es which he had sustained earlier that day in another crap game. Finally, Homer Pearson obtained a shotgun and stated, “I will take care of him,” referring to Brager. Several witnesses interceded with the result that Pearson went back to his automobile and put up the shotgun, then returned a short time later and continued to shoot dice. A few minutes thereafter, Brager reappeared with pistol in hand and fired at Pearson, stating, “I am.going to kill you.” All except one witness testified that Pearson was unarmed at the time of the shooting. Two friends picked up Pearson and drove his body to the Sylacauga hospital where he was subsequently pronounced dead. Appropriate evidence put on by the State of Alabama established that the deceased died of a pistol shot on the night of June 24-25, 1978, while engaged in the crap game outside Thompson’s casino in Tallade-ga County.
I
The appellant contends on appeal that the State of Alabama violated the appellant’s constitutional. rights by failing to provide access to grand jury testimony which might have been used by counsel for the appellant in cross-examining certain of the State’s witnesses. The appellant’s attorney cites us to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).
In Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the United States Supreme Court extended the tests formulated in Mooney v. Holohan by stating, “The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.”
Moreover, the holding in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), reads as follows:
“We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.”
Appellant’s counsel refers us to his cross-examination of State’s witness Lorenzo Teague (Volume I, R. pp. 155-173):
In his testimony on direct, witness Teague had placed the parties at the scene of the crap game and referred to the fact that when Norman Brager reappeared he did so with pistol in hand and he approached the deceased, who was then engaged in shooting dice.
During the cross-examination of Teague, the scene outside the casino at the parking lot was described, as well as the position of several automobiles parked in the lot (this was also described by several other witnesses) as well as the fact that after the initial firing of the pistol by the appellant, Brager, the owner of the club, Robert Thompson also appeared and fired his pistol in an apparent attempt to “break up the shooting.”
The colloquy between defense counsel and the court reads as follows (Volume I, R. pp. 167-171):
“Q. Did you go before the Grand Jury and testify in this case?
“A. Did I go?
“Q. Did you go before the Grand Jury in this case and testify?
“A. Uh ...
“Q. Did you come up here before eighteen people on an earlier date and answer some questions in response to the District Attorney’s questions?
“A. Yes.
“Q. Your Honor, at this time we make a motion to produce those Grand Jury notes.
“MR. LOVE: I object to that. I don’t want to go to jail for that. The Code provides what that _ (INTERRUPTED)
“Q. We make a motion to produce those, Your Honor. Yesterday those notes were used to show a prior inconsistent statement.
“MR. RUMSEY: Your Honor, Your Hon- or, before ... (INTERRUPTED)
*403 “MR. DENSON: I want to make a motion to have those produced.
“MR. RUMSEY: Can we have the jury taken out, Your Honor?
“THE COURT: Mr. Denson, the Code of Alabama provides that the only time that the Grand Jury testimony can in any way be used is to impeach a witness by reason of an inconsistent statement or prosecute them for perjury and otherwise to produce those in open court would be in violation of the laws and put all of us guilty of a misdemeanor. Therefore, I have to sustain the objection.
“MR. DENSON: Your Honor, may I read an exception into the record?
“THE COURT: Certainly.
“MR. DENSON: We respectfully take an exception to the ruling of the Court denying us the opportunity to have available the copy of the Grand Jury’s testimony as this man testified to, and we take exception _
“THE COURT: This man testified to _ this man testified to the Grand Jury?
“MR. DENSON: Yes, Your Honor.
“THE COURT: Was it anything other than ... (INTERRUPTED)
“MR. RUMSEY: Your Honor, he testified before, the November Term, 1978 Grand Jury.
“THE COURT: I understand, but there’s been testimony today — (INTERRUPTED)
“MR. LOVE: No, sir.
“MR. RÜMSEY: No, sir.
“THE COURT: Did I misunderstand you? Okay, overrule.
“MR. DENSON: I’m looking for an inconsistency, Your Honor.
“THE COURT: If you asked him did he make an inconsistent statement or what the statement was, but I cannot in any way allow that testimony. If there was an inconsistent statement I’ll allow you to ask him about that inconsistent statement and lay the foundation for what that inconsistent statement was.
“Q. All right.
“THE COURT: The Grand Jury proceedings is of course secret and cannot be devulged.
“Q. Now when you testified before the Grand Jury _ you remember you came up here in November and testified don’t you?
“A. Yea.
“Q. Did you tell them when you testified that you saw Norman walk up?
“A. Yea.
“Q. And did you tell them what direction he came from?
“A. No, because _
“Q. What did you say?
“A. No, sir.
“Q. You didn’t tell them which direction he came from?
“A. No, sir.
“Q. You’re not certain as to which direction he came from?
“A. No.
“Q. And you saw him just a short time before he arrived up to this group of people. Is that right?
“A. Yea.
“Q. Now when you first saw him — you said you saw him walk up how far away from this group of people was he?
“A. He wasn’t too far from them.
“Q. Pardon? Far from me to you?
“A. From about like that.
“Q. Four or five feet, Your Honor?
“THE COURT: About six feet.
“Q. Remember any of the other people that were standing in this crowd?
“A. No.
“Q. And do you have a judgment as to how many guns were fired that night? During the whole volley of fire?
“A. How many were fired?
“Q. How many?
“A. I don’t know.
“Q. Do you remember how many shots you heard?
“A. I wasn’t trying to count them.
“Q. In your best judgment do you have an opinion?
“A. No, sir.
*404 “Q. How long had you known Homer Pearson, the deceased man?
“A. I been knowing him a good while.
“Q. How long have you been knowing Norman?
“A. I knowed Norman before I knowed him.
“Q. You and Homer were friends weren’t you?
“A. Yes, sir. We was all right.”
At the outset, it should be here pointed out that at no time during trial did the attorney for the State use his notes from the grand jury or the grand jury testimony in presenting the State’s side of this case. See Stroud v. State, 56 Ala.App. 692, 325 So.2d 200, cert. quashed, 295 Ala. 424, 325 So.2d 204.
Moreover, as may be seen, counsel was allowed to inquire if the witness had testified before the grand jury and if in fact he had made some prior inconsistent statement at trial. An extensive cross-examination was allowed defense counsel in examining each witness.
In our examination of this record we do not find any pretrial motion whatever by way of discovery, nor do we find that the State of Alabama withheld or suppressed any evidence favorable to the accused. To the contrary, our examination reveals that the State’s witnesses testified that the deceased, Pearson, had initially threatened the appellant, Brager, before various parties at the scene prevailed upon Pearson to put his shotgun away and go for a ride.
The evidence at trial established that Pearson did so and then returned to the casino and reentered the crap game. Only one witness indicated that Pearson was armed, whereas a number of witnesses for both the State and the defense testified that the deceased, Pearson, was unarmed at the time he was fatally wounded. One witness endeavored to say that Pearson had “a can of beer,” but no pistol, shotgun, or rifle.
We are therefore clear to the conclusion that the State of Alabama did not unconstitutionally suppress evidence favorable to the accused, nor allow false evidence to go uncorrected to the jury.
Further, the appellant’s request to see the grand jury testimony was properly denied by the trial judge. Thigpen v. State, 49 Ala.App. 233, 270 So.2d 666 (1972); State ex rel. Baxley v. Strawbridge, 52 Ala.App. 685, 296 So.2d 779, cert. denied 292 Ala. 506, 296 So.2d 784 (1974); and State ex rel. Baxley v. Archer, Ala.Cr.App., 335 So.2d 240 (1976).
II
We have carefully examined this record and find no error therein. Extensive cross-examination was allowed as to each witness for both sides and the State established a prima facie case.
The trial court properly instructed the jury on the applicable law to which no exception was taken.
The judgment is therefore due to be and is hereby
AFFIRMED.
All the Judges concur.